**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **FAS TECHNOLOGIES, LLC,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | **NO. 3:06-cv-02217** |
| v. | § | |
| | § | **JURY DEMANDED** |
| **HIRATA CORPORATION AND** | § | |
| **TOKYO ELECTRON LTD.** | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff FAS Technologies LLC ("FAS") brings this action for statutory theft of trade secrets, misappropriation of trade secrets, fraud, conversion, unjust enrichment, civil conspiracy and intentional interference with a contractual relationship against Defendants Hirata Corporation ("Hirata") and Tokyo Electron Ltd. ("TEL"), and alleges as follows:

### I.   THE PARTIES

1.   FAS is a Texas limited liability company with offices located at 10480 Markison Road, Dallas, Texas 75238.

2.   Defendant Hirata is a Japanese corporation having a principal place of business at 3-9-20 Togoshi, Shinagawa, Tokyo 142-0041, Japan.

3.   Defendant TEL is a Japanese corporation having a principal place of business at TBS Broadcast Center, 3-6 Akasaka 5-chrome, Minato-ku, Tokyo 107-8481, Japan.

## II.    JURISDICTION AND VENUE

4.     The Court has jurisdiction over this lawsuit under 28 U.S.C. §1332(a) because (i) there is complete diversity in that Plaintiff, FAS, is a Texas limited liability company and all of its members are citizens of Texas and New Mexico and Defendants, Hirata and TEL, are citizens of Japan with their principal places of business in Japan; and (ii) the amount in controversy exceeds $75,000, excluding interest and costs.

5.     Personal jurisdiction exists generally over Hirata and TEL because each of them has sufficient minimum contracts with the forum as a result of business conducted within the State of Texas and the Northern District of Texas.  Personal jurisdiction also exists specifically over Hirata and TEL because each of them entered into contractual relationships with FAS within the State of Texas and the Northern District of Texas.  In addition, personal jurisdiction exists over Hirata and TEL because both committed intentional torts within the State of Texas and the Northern District of Texas.

## III.    BACKGROUND

6.     FAS is a Dallas-based technology company that pioneered the field of advanced, high-precision coating systems for thin film applications.  FAS and its affiliates were funded in part by the U.S. Defense Advanced Research Projects Agency, the central research and development organization for the U.S. Department of Defense charged with maintaining U.S. technological superiority in fields critical to U.S. national security.

7.     FAS is the originator of "digital dispense" technology and "spinless" or "extrusion" coating technology (collectively, "FAS Coat™").  FAS Coat™ technology is used worldwide in spinless coating systems ("Coating Systems") and other equipment used to coat flat panel displays ("FPDs") such as computer monitors, LCD screens for television applications and

other types of display applications.  FAS Coat™ technology is proprietary to FAS and protected under trade secret, copyright and patent laws.

8. FAS holds approximately 20 U.S. patents, several international patents and has several pending U.S. and international applications, including Japanese applications.

9. In addition to its extensive patent portfolio, over the past decade and at a cost of nearly $50 million, FAS developed an extensive bank of confidential and proprietary information and trade secrets (collectively, the "FAS Trade Secrets") regarding extrusion die design, dispense/filtration pump design, crossbar design, flexure design, priming device design, linear transport design, vacuum chucks, head positioning/leveling routine, substrate tracking routine, coating recipe routines, general machining techniques, general assembly techniques, software related to coating machinery and processes, tuning of extrusion parameters/coating recipes, coater setup, and specialized knowledge and experience related to coating fluids.

10. TEL was founded in 1963 and was the first Japanese corporation to introduce U.S. semiconductor production equipment and integrated circuit (IC) testers to Japan.

11. By 1993, TEL had expanded its product line to include spin-coating systems used to coat semiconductor wafers.

12. In 1994, TEL approached FAS regarding its FAS Coat™ technology because it recognized the vast improvements FAS Coat™ spinless technology offers over spin-coating systems.  TEL representatives visited FAS's Dallas facility on several occasions and each time they entered, they executed FAS's standard sign-in sheet (the "Sign-In Sheet").  Under the Sign-In Sheet, each TEL representative agreed to hold all FAS Trade Secrets in strict confidence and not to use the FAS Trade Secrets for their own benefit or for the benefit of third parties except as permitted under other definitive agreements between the parties.

13. After extended discussions and negotiations, TEL and FAS entered into a definitive agreement on December 28, 1994 (the "1994 Agreement"). Under the 1994 Agreement, FAS agreed to manufacture several prototypes of the core components required by Coating Systems for TEL and to cooperatively improve and modify such prototypes for possible integration with TEL's spin-coating technology.

14. The 1994 Agreement required FAS to disclose FAS Trade Secrets to TEL and obligated TEL to hold them in confidence.

15. Under the 1994 Agreement, any modifications to the components manufactured by FAS were to be owned solely by FAS. The 1994 Agreement was later amended so that any new intellectual property developed jointly by FAS and TEL was owned by them jointly but no such new intellectual property was developed.

16. FAS and TEL entered into a second agreement on June 28, 1996 (the "1996 Agreement") whereby FAS and TEL agreed to jointly develop a Coating System.

17. Under the 1996 Agreement, FAS granted TEL a limited license to FAS's Trade Secrets and FAS Coat™ technology embedded in the jointly-developed Coating Systems.

18. It was agreed that FAS would be the exclusive supplier and manufacturer of certain core components of the newly-developed Coating System and that TEL would manufacture the remaining portions and assemble the final Coating System and market and sell it to its customers.

19. The 1996 Agreement obligated TEL to hold all information disclosed to TEL by FAS, including the FAS Trade Secrets, in confidence and not disclosed it to third parties.

20. Upon information and belief, in 2000, TEL determined not to fulfill its obligations to FAS and to use another manufacturer to produce the Coating Systems it desired to market and sell.

21. Upon information and belief, TEL selected Hirata as its contract manufacturer of Coating Systems in 2003.

22. After FAS learned that Hirata intended to manufacture Coating Systems for TEL, it contacted Hirata and informed it that it could not do so legally without obtaining a license from FAS.

23. After receiving this warning from FAS, Hirata sent representatives to FAS's Dallas facility in order to discuss a potential relationship with FAS.

24. Each Hirata representative who entered FAS's Dallas facility, including Mr. Yasunari Hirata, the founder and current chairman of Hirata, first executed Sign-In Sheets pursuant to which each Hirata representative agreed to hold all FAS Trade Secrets in strict confidence and not to use the FAS Trade Secrets for their own benefit or for the benefit of third parties except as permitted under other definitive agreements.

25. After executing the Sign-In Sheets, Hirata's representatives were allowed to tour FAS's Dallas facility where they viewed FAS's manufacturing area for Coating Systems and various related components and equipment.

26. Having satisfied itself that FAS indeed possessed the requisite expertise, technology and facilities, Hirata agreed to supplement its existing agreements under the Sign-In Sheets with a formal Non-Disclosure Agreement dated April 1, 2001 ("NDA").

27. Pursuant to the NDA, Hirata recommitted to hold all FAS Trade Secrets in strict confidence and not to use the FAS Trade Secrets for its own benefit or for the benefit of third parties except as contemplated in future agreements anticipated by FAS and Hirata.

28. After executing the NDA, Hirata and FAS entered into additional discussions and negotiations, in which Hirata informed FAS that it desired to enter the highly competitive and profitable business of manufacturing Coating Systems.

29. Hirata realized that a partnership with FAS that provided it with access to cutting-edge FAS Coat™ technology and with a license to practice FAS's patented inventions would allow it to shave years off of the projected time to bring Coating Systems to market and would save tens of millions of dollars in research and development costs.

30. Hirata informed FAS that it wished to embark on what it called a Joint Development Program ("JD Program") in order to combine FAS Coat™ technology with Hirata's automation technology to bring a jointly developed Coating System to market by January 1, 2002.

31. FAS informed Hirata that it had invested nearly $50 million in developing the FAS Coat™ technology and that it would not disclose the FAS Coat™ technology to Hirata or grant Hirata a license to practice its patented inventions without a substantial, long-term commitment from Hirata.

32. In response, Hirata represented to FAS that it would make an investment in FAS in order to offset a portion of the research and development costs associated with developing the FAS Coat™ technology and that it intended to form joint-venture entities with FAS in the United States and Japan that would manufacture and sell the jointly-developed Coating Systems.

33. In connection with these discussions, Hirata and FAS entered into a Business Venture Agreement on or about June 30, 2001 ("BVA") to further document these agreements.

34. Under the BVA, FAS agreed to sell two Coating Systems to Hirata at a substantially reduced price.

35. Each of FAS and Hirata agreed to grant a royalty-free, non-exclusive license to each patent of the other party for activities covered by the BVA and under the JD Program.

36. FAS and Hirata also agreed that all intellectual property and know-how developed during the term of the BVA and under the JD Program (collectively, the "New IP") would be jointly owned by FAS and Hirata and available for free use as defined in the BVA. FAS and Hirata would cooperate to seek patents covering the New IP where appropriate, which would be jointly owned by FAS and Hirata.

37. FAS and Hirata agreed that though such joint ownership and rights related to the New IP would survive the termination of the BVA, they do not diminish the value of a license or provide a license to make, use or sell any products of any nature covered by existing patents or intellectual property held by either party prior to execution of the BVA or upon termination of the BVA.

38. On October 30, 2001, FAS and Hirata entered into an additional Non-Disclosure Agreement dated October 30, 2001 ("Additional NDA") pursuant to which Hirata once again agreed to hold all FAS Trade Secrets in strict confidence and not to use the FAS Trade Secrets for its own benefit or for the benefit of third parties except as contemplated in future agreements anticipated by FAS and Hirata.

39. On the same day, FAS and Hirata entered into a Definitive Business Venture Agreement dated October 30, 2001 ("DBVA") that made it clear that the initial investigations

and discussions regarding the feasibility of the JD Program conducted under the BVA had been concluded and were successful and that FAS and Hirata had agreed to formally begin the tasks required to implement the JD Program as outlined in attachments to the BVA and the DBVA.

40.     On August 1, 2002, FAS's Asian affiliate and Hirata entered into a License and Component Supply Agreement ("LCSA") pursuant to which FAS agreed to supply Hirata with certain technology and know-how related to an EX Coating System to be developed and sold as part of the JD Program.

41.     Based on the representations and promises of Hirata, FAS also agreed to provide Pump-On Heads for EX Coating Systems for the extremely discounted price of $63,500 per coater, which includes a license for each EX Coating System.

42.     The LCSA was followed by an Amendment to License and Component Supply Agreement dated November 1, 2002 ("ALCSA") that adjusted the still-heavily discounted price FAS agreed to extend to Hirata under the LCSA.

43.     On January 21, 2004, FAS and Hirata entered into a Memorandum of Understanding ("MOU") that further defined FAS's and Hirata's joint efforts to develop and manufacture photo resistant Coating Systems.

44.     The MOU required FAS to provide Hirata with access to all of the FAS Trade Secrets.

45.     The MOU also granted Hirata a license to manufacture and sell 40 Coating Systems solely as an OEM of TEL.

46.     FAS agreed to enter into the MOU based on TEL's representations that it would make good on its promises under the DBVA to complete the JD Program and that if FAS granted Hirata licenses to manufacture and sell 40 Coating Systems to TEL for the extremely discounted

amount of only $26,750 per license (a discount of over 50 percent), substantial additional orders from TEL would follow and Hirata and FAS would enjoy a long, profitable relationship pursuant to which Hirata would pay FAS a license for every Coating System it manufactured

47. In consideration of its agreements under the MOU, Hirata paid FAS the discounted amount of $1,070,000.

48. As previously stated in the DBVA, Hirata once again agreed to cooperate to seek appropriate patent protection and to protect all confidential information, trade secrets, etc. developed under the MOU.

49. Under the MOU, FAS once again agreed to provide Hirata with complete access to the FAS Trade Secrets.

50. By letter dated January 14, 2005, after being given complete access to the FAS Trade Secrets, Hirata inexplicably informed FAS that it had determined not to renew the MOU.

51. Hirata further stated that under the MOU, it had paid for the right to manufacture and sell 40 Coating Systems and that it retained such rights despite the expiration of the MOU.

52. FAS responded by informing Hirata that, in accordance with the clear terms of the MOU, any license rights granted to Hirata by FAS expired with the MOU.

53. By letter dated November 30, 2005, Hirata asserted one of FAS's core patents had expired and that, contrary to the terms of its various agreements with FAS, Hirata was no longer obligated to pay FAS royalties for using the FAS Trade Secrets or the inventions covered by its patents. Hirata also claimed that market conditions prevented it from paying royalties to FAS unless its competitors were required to do the same.

54. Subsequently, FAS learned that Hirata manufactured more than 40 Coating Systems during the term of the MOU and has manufactured and sold more than 70 Coating Systems for hundreds of millions of dollars since the expiration of the MOU.

55. In short, once Hirata obtained access to the FAS Trade Secrets and learned how to manufacture Coating Systems without the years of research and tens of millions of dollars it would have been required to spend on development and testing, Hirata refused to invest in FAS, to form joint venture companies or to work with FAS to jointly seek patent protection for the New IP. Instead, Hirata converted the FAS Trade Secrets for its own use and kept all of the New IP for itself and its own benefit.

56. If FAS knew that Hirata would not make good on the numerous promises it made regarding a long and prosperous partnership pursuant to which FAS and Hirata would share the benefits of combining the FAS Trade Secrets with the automation technology of Hirata and would convert the FAS Trade Secrets for its own use, FAS would not have entered into any agreement or disclosed the FAS Trade Secrets to Hirata.

57. Upon information and belief, TEL was aware of Hirata's agreements with FAS at all times relevant hereto.

58. Upon information and belief, TEL and Hirata entered into several agreements pursuant to which Hirata manufactures Coating Systems for TEL as and OEM and TEL actively encouraged Hirata to disclose the FAS Trade Secrets to TEL in order to allow TEL to market and sell Coating Systems manufactured by Hirata to TEL customers.

59. Upon information and belief, Hirata and TEL closely coordinated Hirata's dealings and relationship with FAS, and TEL, as Hirata's most important customer of Coating

Systems that incorporate the FAS Trade Secrets, largely controlled Hirata's decision-making process related to its dealings with FAS.

60. Upon information and belief, TEL is aware of FAS's ownership of the FAS Trade Secrets and Hirata's contractual obligations to protect the FAS Trade Secrets and not to disclose the FAS Trade Secrets to third parties or use the FAS Trade Secrets for its benefit or for the benefit of third parties outside of the various agreements between Hirata and FAS and without paying FAS for a license.

61. Upon information and belief, TEL has encouraged Hirata to continue manufacturing and selling Coating Systems to TEL and has contracted to purchase such Coating Systems from Hirata without acquiring the proper licenses from FAS.

### IV.    STATUTORY THEFT OF TRADE SECRETS

62. FAS repeats the allegations in paragraphs 6 through 61 as if set forth herein.

63. Under its various agreements with FAS, Hirata and TEL had confidential relationships with FAS that required it to keep the FAS Trade Secrets confidential and not to use the FAS Trade Secrets for its benefit or the benefit of third parties in breach of such agreements.

64. Hirata and TEL misappropriated and used the FAS Trade Secrets to manufacture Coating Systems. In doing so, Hirata and TEL misappropriated the FAS Trade Secrets in violation of Texas Theft Liability Act. TEX. CIV. PRAC. & REM. CODE ANN. § 134.001-.005 (2006).

65. As a result of such theft, FAS has sustained and will continue to sustain substantial damages in an amount not presently known.

### V.    MISAPPROPRIATION OF TRADE SECRETS

66. FAS repeats the allegations in paragraphs 6 through 65 as if set forth herein.

67. Under its various agreements with FAS, Hirata and TEL had confidential relationships with FAS that required it to keep the FAS Trade Secrets confidential and not to use the FAS Trade Secrets for its benefit or the benefit of third parties in breach of such agreements.

68. By misappropriating and using the FAS Trade Secrets without its consent to build Coating Systems, Hirata and TEL misappropriated the FAS Trade Secrets in violation of Texas law.

69. As a result of such misappropriation, FAS has sustained and will continue to sustain substantial damages in an amount not presently known.

## VI.     FRAUD

70. FAS repeats the allegations in paragraphs 6 through 69 as if set forth herein.

71. Upon information and belief, Hirata and TEL never intended to abide by the terms of their agreements with FAS and lied to FAS in order to access the FAS Trade Secrets. This is evidenced by Hirata's and TEL's wilful and blatant breach of their contractual obligations to FAS and its disregard for FAS's intellectual property rights.

72. Upon information and belief, TEL supported Hirata (financially and otherwise) in its efforts to access the FAS Trade Secrets. TEL never intended for Hirata to pay FAS for licenses to the Coating Systems TEL intended to, and has, ordered from Hirata and encouraged Hirata not to pay such license fees to FAS. This is evidenced by the fact that though TEL knows that Hirata has no license to continue manufacturing and selling Coating Systems to TEL, TEL has continued to order Coating Systems from Hirata in blatant disregard for FAS's intellectual property rights.

73. In order to gain access to the FAS Trade Secrets, Hirata, with the support of TEL (financial and otherwise), made the following representations to FAS (this is an illustrative, rather than exclusive, list):

    i. Hirata and TEL would protect the FAS Trade Secrets and Intellectual Property;

    ii. Hirata would make an investment in FAS and form U.S. and Japanese subsidiaries with FAS that would own the New IP and manufacture and sell Coating Systems;

    iii. Hirata and TEL would not misappropriate the FAS Trade Secrets or use them for its benefit or the benefit of third parties outside of the scope of its agreements with FAS;

    iv. Hirata and TEL would not manufacture Coating Systems without a license from FAS.

74. These representations were false. FAS relied on Hirata's and TEL's representations to its detriment and gave Hirata and TEL access to the FAS Trade Secrets.

75. As a result of Hirata's and TEL's intentional and knowing misrepresentations, FAS has sustained and will continue to sustain substantial damages in an amount not presently known. In addition, the Court should assess punitive damages against Hirata and TEL.

## VIII. CONVERSION

76. FAS repeats the allegations in paragraphs 6 through 75 as if set forth herein.

77. Hirata and TEL have misappropriated and converted to their own use the FAS Trade Secrets.

78. As a result of Hirata's and TEL's wilful and intentional conversion, FAS has sustained and will continue to sustain substantial damages in an amount not presently known. In addition, the Court should assess punitive damages against Hirata and TEL.

## IX. UNJUST ENRICHMENT

79. FAS repeats the allegations in paragraphs 6 through 78 as if set forth herein.

80. Hirata and TEL have benefited from and have been unjustly enriched by the acts described above. An accounting and a constructive trust should be imposed on Hirata's and TEL's profits from the unlawful use of the FAS Trade Secrets and the profits should be paid to FAS.

## X. CIVIL CONSPIRACY

81. FAS repeats the allegations in paragraphs 6 through 80 as if set forth herein.

82. Upon information and belief, Hirata and TEL agreed to commit unlawful acts including stealing, misappropriating, and converting the FAS Trade Secrets. Acting in concert, Hirata and TEL did steal such FAS Trade Secrets and are currently using them to produce Coating Systems. Because Hirata and TEL are not paying FAS, the owner of the technology upon which their Coating Systems are based, a royalty, Hirata and TEL have an unfair advantage over competitors that manufacture and sell Coating Systems and pay license fees to FAS.

83. As a result of the civil conspiracy between Hirata and TEL, FAS has sustained and will continue to sustain substantial damages in an amount not presently known.

## XI. TORTIOUS INTERFERENCE WITH A CONTRACT

84. FAS repeats the allegations in paragraphs 6 through 83 as if set forth herein.

85. Hirata and TEL have knowledge that each of them are parties to the contracts with FAS detailed herein regarding the ownership of the FAS Trade Secrets and Hirata's and TEL's inability to manufacture Coating Systems without paying license fees to FAS.

86. Upon information and belief, despite this knowledge, Hirata and TEL have induced one another to breach their contractual obligations to FAS and to produce Coating Devices without obtaining a license from FAS.

87. In doing so, Hirata and TEL have intentionally and tortiously interfered with the contractual relationships that exist between Hirata, TEL and FAS.

88. As a result of such tortious interference, FAS has sustained and will continue to sustain substantial damages in an amount not presently known.

## X.    PRAYER FOR RELIEF

FAS respectfully requests that judgement be entered in its favor and against Defendants Hirata and TEL and that the Court grant the following relief to FAS:

   i.   actual damages;

   ii.  punitive damages;

   iii. interest on FAS's damages;

   iv.  attorney's fees and costs under the Texas Theft Liability Act;

   v.   attorney's fees under Texas Civil Practice and Remedies Code § 38.001;

   vi.  an accounting and constructive trust on Hirata's and TEL's profits; and

   vii. such other relief as the Court deems just and proper.

## XI.     JURY DEMAND

In accordance with Federal Rule of Civil Procedure 38 and 39, Plaintiff asserts its rights under the Seventh Amendment of the United States Constitution and demands a trial by Jury on all issues.

                                  Respectfully submitted,

                                  **OHASHI & HORN LLP**
                                  Republic Center
                                  325 N St. Paul Street, Suite 4400
                                  Dallas, Texas 75201
                                  214.743.4170
                                  214.743.4179 (Fax)

By:    ___s/ Jeff J. Horn Jr._____
           Jeff J. Horn, Jr., Attorney-in-Charge
           State Bar No. 24027234
           jeffhorn@ohashiandhorn.com

           **SHORE CHAN BRAGALONE LLP**
           Republic Center
           325 North Saint Paul Street, Suite 4450
           Dallas, Texas 75201
           214.593.9110 Telephone
           214.593.9111 Facsimile

           Michael W. Shore
           Texas State Bar No. 18294915
           shore@shorechan.com
           Jeffrey Bragalone
           Texas State Bar No. 02855775
           Jbragalone@shorechan.com
           Alfonso Garcia Chan
           Texas State Bar No. 24012408
           achan@shorechan.com
           Joseph F. DePumpo
           Texas State Bar No. 00787355
           jdepumpo@shorechan.com