**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FAS TECHNOLOGIES, LLC,<br><br>                  Plaintiff,<br><br>                v.<br><br>HIRATA CORPORATION, et al.,<br><br>                  Defendants. | Civ. Action No. 3:06-cv-02217 |

**APPENDIX TO**
**MOTION BY DEFENDANT HIRATA CORPORATION**
**TO COMPEL ARBITRATION AND DISMISS**

**EXHIBIT A:**

**Non-Disclosure Agreement ("NDA"), April 1, 2001**

## NON-DISCLOSURE AGREEMENT

THIS NON-DISCLOSURE AGREEMENT (referred as "NDA") dated as of April 1, 2001 (referred as "Effective Date") by and between Hirata Corporation having its principal offices at 3-9-20 Togoshi, Shinagawa, Tokyo 142-0041 Japan (referred as "HIRATA) and FAS Technologies, Ltd. having its principal offices at 10480 Markison Road, Dallas, Texas 75238, USA and its wholly owned subsidiary FAS Asia Ltd. having its principal offices at 11-2, Toranomon 5-chome, Minato-ku, Tokyo 105-0001, Japan (Collectively referred as "FAS").

WHEREAS, the above referenced parties may provide to each other certain proprietary, confidential and trade secret information in connection with a collective business purpose among the parties each desires that any such information shall be kept confidential by the other party: and

WHEREAS, in consideration of the foregoing, the mutual covenants contained herein and other valid consideration, the receipt and sufficiency of which are hereby acknowledged, each party is willing to keep such information confidential in accordance with the terms and conditions set forth in this NDA;

NOW, THEREFORE, the parties hereby agree as follows:

## 1. Confidentiality

    1.1.    Each party agrees to hold all information that is communicated to such party by the other relating to or arising in connection with the collective business purpose, whether written or oral, and whether received prior to or subsequent to the Effective Date, ("Confidential Information") in strict confidence; to not use the Confidential Information for its own benefit or the benefit of others, except for the collective business purpose or as may be otherwise authorized in writing by the disclosing party; and to not disclose, distribute or disseminate the Confidential Information or documents or information derived therefrom in any way to any third party, except its respective employees and agents having a specific need to know in performance of their work for the recipient party and who have been informed of the recipient party's obligation under this NDA and have agreed to be bound thereby (collectively, "Representatives"). The recipient party assumes responsibility for compliance with, and any breach of this NDA by its Representatives. The recipient party shall take steps no less rigorous than those it takes to protect its own proprietary information, but in any event no less than reasonable means, to prevent the disclosure and to protect the confidentiality of the Confidential Information.

APP.02

1.2.   Without limitation of the foregoing, "Confidential Information" shall mean and include all nonpublic, confidential, or proprietary information, including, but not limited to, the methods and processes operation; identities of customers, suppliers and employees; production information; trade secrets; confidential processes and technology; pricing information; software program and related documentation; know-how; research; inventions; and other information of the disclosing party, which is not made generally available to persons outside the disclosing party, or of another party whose information the disclosing party has or may have in its possession under obligations of confidentiality, which is disclosed as such by the disclosing party to the recipient party as well as any other information that is marked or otherwise identified as confidential or proprietary, or that the receiving party knows is confidential or proprietary, and may be (i) conveyed in writing, or graphic form (ii) disclosed orally or electronically; or (iii) learned or observed in the course of discussions, studies or other work undertaken between the parties. Confidential Information shall also include all analyses, compilations, reports, studies or other documents, data or information prepared by a recipient party that contain, are derived from or reflect any Confidential Information received from disclosing party.

1.3.   Notwithstanding the above, Confidential Information shall not include information which is (i) already known by the recipient party without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of the recipient party, (iii) disclose to the recipient party by a third party not in violation of any obligations of confidentiality to the disclosing party, (iv) independently developed by the recipient party without use of the Confidential Information, (v) disclosed without similar restrictions by the disclosing party to a third party, or (vi) approved in writing by the disclosing party for disclosure. Nothing herein shall be construed to limit or prevent the use or disclosure of Confidential Information by the party owning such Confidential Information.

1.4.   In the event the recipient party is required to disclose Confidential Information pursuant to a requirement of a governmental agency or law, the recipient party shall provide the affected disclosing party with timely written notice of such requirement prior to any such disclosure in order to provide the disclosing party an opportunity to prevent or limit such disclosure.

## 2. Return of Confidential Information

Upon request if no longer necessary for completion of the collective business purpose, the recipient party shall return all copies of the Confidential Information, and all derivatives thereof, to the disclosing party or, if so requested by the disclosing party, certify in writing that all copies of the Confidential Information have been destroyed. A

APP.03

party may return Confidential Information, or any part thereof, to the other party at any time. If requested by the disclosing party, an officer of the receiving party shall certify in writing that all such Confidential Information of the other was returned, erased, deleted or destroyed. The rights and obligations of the parties under this NDA shall survive any such return or destruction of Confidential Information.

## 3. Term

With respect to any particular Confidential Information, the recipient party's obligation under the NDA shall expire five (5) years after the recipient party's receipt of that Confidential Information.

## 4. No Warranty

Except as may be otherwise agreed by the parties in writing, neither party makes any representation or warranty, express or implied, with respect to any Confidential Information and neither party shall be responsible for any expenses, losses or actions incurred or undertaken by the other party as a result of the receipt and use by such party of Confidential Information of the other party.

## 5. No Further Rights

All Confidential Information disclosed pursuant to this NDA shall be and remain the property of the disclosing party. Nothing contained in this NDA shall be construed as granting or conferring any rights by license or otherwise in Confidential Information except for the use of such Confidential Information as expressly provided herein.

## 6. No Claim

Both parties hereto shall not make any claims including any litigation against the other party based upon that Confidential Information obtained from the other party.

## 7. Business Purpose

Unless otherwise agreed by the parties in writing the parties expressly agree that the provision of Confidential Information hereunder and any discussions held in connection with the collective business purpose shall not prevent the parties from pursuing similar discussions with third parties or obligate the parties to continue discussions with the other or to take, continue or forego any action relating to the collective business purpose. Any estimates or forecast provided by the parties to one another shall not constitute commitments.

## 8. Dispute and Governing Law

APP.04

In the event of any dispute between the parties arising from the execution of or in connection with this NDA, the parties shall exert their best efforts for good faith negotiation to amicably settle such dispute. To the extent the parties are not able to amicably resolve the dispute, the dispute shall be resolved according to the rules of the International Arbitration Association. Any arbitration action taken by HIRATA against FAS shall be conducted in Dallas Texas, U.S.A., and any action taken by FAS against HIRATA shall be conducted in Tokyo, Japan. This NDA shall be governed by and construed in accordance with the substantive laws of Japan.

## 9. Miscellaneous

9.1.   Any notice under this NDA will be deemed to be given if in writing and delivered in person or by overnight delivery service addressed to the recipient party at its address first set forth above. The parties may from time to time change their address or designated representative for notification purposes by giving the other party prior written notice of the new address or designated representative and the date such change will become effective.

9.2.   The parties agree that this NDA (i) is the complete and exclusive statement between the parties with respect to the protection of the confidentiality of the Confidential Information; (ii) supersedes all related discussions and other communications between the parties with respect to such subject matter; (iii) may be modified only by the a written instrument executed by the parties to this NDA; (iv) shall be governed by and construed in accordance with the substantive laws of Japan; and (v) shall be binding on the parties and their successors and assigns, provided that no party may assign its rights or obligations under this NDA without the prior written consent of the other party. No party shall act or have authority to act as an agent of the other party pursuant to this NDA for any purpose whatsoever. The unenforceability or invalidity, as determined by a court of competent jurisdiction, of any provision of this NDA shall not render unenforceable or invalid any other provision of this NDA. No change or modification of this NDA shall be valid or binding upon the parties hereto unless such change or modification shall be in writing and signed by the parties hereto. No waiver of any term or condition of this NDA shall be enforceable unless it shall be in writing and signed by the party against which it is changed.

IN WITNESS WHEREOF, the parties hereto have executed this NDA as of the date first set forth above.

### 機密保持契約

　本機密保持契約　NON-DISCLOSURE AGEEMENT（以下 "NDA" という）は、本社を
日本国東京都品川区戸越３－９－２０に有する平田機工株式会社（以下、平田という）と、
本社を、アメリカ合衆国テキサス州、ダラス、マーキソンロード１０４８０に有する
ＦＡＳテクノロジーズ Ltd. 及びその子会社であり本社を、東京都港区虎ノ門５－１１－２
に有する FAS アジア Ltd.（以下、FAS という）との間で 2001 年４月１日よりその効力を
発する。（以下「発効日」"Effective Date"という）

　上記当事者は、共同のビジネス目的に関わる互いが所有している、機密事項、取引上の機
密情報を提供し合うことができる。当事者それぞれは、上記機密情報は第三者に対して機
密扱いとすることを望むものである。

　上記を考慮し、当事者たちの誓約条項にはお互いに認め合った有益な思案要項及び、本 NDA
に述べられている期間と条件に従って、各当事者は機密を保持する。

　ここに三者は以下の通り合意する。

1. 機密保持

1.1.　三者は次の事項に合意をした：
　　　共通のビジネス目的のために相互に開示されたすべての情報は、書面又は口頭で
　　　も、また発効日以前でも以後でも、三者は厳重に他者に開示しないものとする。
　　　又、共通のビジネス目的の為に限定される場合を除き、もしくは開示側によって
　　　文書で認められた場合を除き、機密情報を被開示側はその固有の利益のため、も
　　　しくは第三者の利益の為に用いることは許されない。当事者双方の従業員や代理
　　　店が被開示側の作業達成の為に必要がある場合を除き、又、本 NDA に述べる被開
　　　示側の履行義務を理解し、またそれに拘束されることを理解している従業員、代
　　　理店に対する場合を除き、第三者に機密情報を開示したり広めたり、流通させて
　　　はならない。

1.2　　前述事項に制限されることなく、「機密情報」とは、すべての非公知、機密、独占

APP.06

情報を意味するものでなければならない。これにはメソッドやプロセス業務が含まれ、制限なく顧客、供給者、従業員の身元；製造条件；取引上の機密；機密性のあるプロセスやテクノロジー；価格情報；ソフトウエアプログラムと関連するドキュメンテーション；ノウハウ；リサーチ；発明；さらに開示側の関連する其の他の情報を意味するものでなければならない。それは、開示側の外部では入手不可能な情報、開示側が機密保持の制約のもとに保有するかまたはその可能性のある、第三者の情報で、開示側によって被開示側に開示されたもの、及び極秘あるいは独占と表示された其の他の情報。受け手側の知る情報が極秘あるいは独占であり、それが(I)文書やグラフィックで表される、(ii)口頭あるいは電子情報で開示される、(iii)当事者間の検討、研究、其の他の作業過程で確認され、認知されるものであるとする機密情報には、開示側から受け取ったあらゆる機密情報が反映され、由来しているすべての分析、コンピレーション、レポート、研究、あるいは其の他のドキュメント、開示側によって用意され、被開示側に渡されたデータまたは情報が含まれなければならない。

1.3     上記条項とは関係なく、機密情報には次の情報は含まれない。(I)機密保持義務の制約が該当しない、すでに被開示者側に知られている情報。(ii)被開示側にとって非合法的行為をおこすことなく、公知であるかまたは公知のものとなった情報。(iii)被開示側機密保持義務の制約に違反することなく第三者によって伝えられた情報。(iv)機密情報を利用することなく被開示側で独自に開発したもの。(v)同様の制限を課すことなく第三者に開示側から開示されたもの。または、(vi)開示側によって書面で開示を認可したもの。機密情報を所有者する者は、機密情報の開示や利用を制限または阻止する目的で機密情報を解釈してはならない。

1.4     被開示側が政府機関や法律の要求に応じて機密情報を開示することを求められた場合は、被開示側は開示に先立ち、関係する開示側に対してそのことを書面で通知し、開示側が開示を制限あるいは防止する機会をもてるようにしなければならない。

2.  機密情報の返還

共同のビジネス目的終了に伴い、その後必要ないとの要請に応じて被開示側は機密情報のコピー全て及びそれより派生した一切の情報を開示側に返還しなければならない。また開示側より要請があれば、全ての機密情報のコピーは破棄されたと書面にて証言しなければならない。被開示側は機密情報をいつでも返還することができるし、あるいはいつでも、どの部分についても開示側に返還することができる。開示側からの要請があれ

2

ば、被開示側の担当者は書面にて、相手側の機密情報の全てについて返還、削除、破棄されたことを証言しなければならない。本 NDA による権利と制約により、機密情報の返還や破棄が義務付けられる。

3. 契約期間

本機密情報のいかなるものについても、NDA に基づき被開示側は機密情報受理後 5 年間拘束される。

4. 無保証

当事者同士が別段に書面で合意した場合を除き、当事者はいかなる機密情報についても叙述又は保証、表明暗示することはしない。さらに、開示側の情報を受理し利用した結果において生じた出費、損失又は訴訟について、開示側は一切責任を負わない。

5. 権利の延長

本 NDA に準じて開示された機密情報は全て開示側に所有権がありそれは維持される。本 NDA の内容はライセンスによる権利又は機密情報にある権利を譲渡するもの、と解釈されてはならない。ただし、機密情報の利用が明確に規定されている場合は対象外となる。

6. 要求の制限

ビジネス・ベンチャー・アグリーメント（"AGREEMENT"）を交渉中に得られた情報はいかなる情報も、相手方の訴訟に利用されることはないし、協議とコミュニケーションの解決手段として、法の下に保護された情報とみなされなくてはならない。

7. ビジネスの目的

当事者間で別段に書面で合意されたものでない限り、機密情報の規定と共通ビジネス目的に関連して行われた協議は、当事者が第三者と同様な協議を遂行することを妨げるものであってはならないし、当事者に他者との協議を強制するものであってはならない。さらに共同ビジネスに関連した訴訟の手続き、続行あるいは放棄することを強要するものであってはならない。当事者同士による評価や予測は、第三者に対する言質を与えるものではない。

3

8. 争議及び適用法律

本 NDA の実行にあたって、もしくはそれに関連して、当事者間に論争が生じた場合、
当事者は誠意をもって協議し争議の好意的解決に向けた努力を惜しんではならない。
それが不可能である場合は、争議は国際調停協会（International Arbitration
Association）の規定に従って解決されなければならない。平田機工が FAS に対して
起こした調停訴訟は米国、テキサス州、ダラスにて実行され、FAS が平田機工に対し
て起こした訴訟は日本国、東京都で実行されるものとする。本 NDA は日本国の法律に
基づいて統治、解釈されなければならない。

9. その他

9.1. 本 NDA に基づいた告知が書面でなされた場合は、先に明記された被開示者の
住所宛に人により、または宅配サービスによって配達されることになる。当事者
は時に応じて住所、また通知の目的のための指定代理人を変更することができる。
その場合は予め相手方に書面で新住所と新代理人について、またそれが発効とな
る予定日を伝える。

9.2. 当事者は、NDA が (I) 機密情報の機密保持は、当事者間で、完璧に排他的に述
べられていて；(ii)当事者間での重要事項に関連する協議とコミュニケーションの
全てに当てはめられるものであり(iii)相手方によって書面でなされた場合にのみ、
NDA を変更することができる。(iv)日本国の法律に従って統治、解釈がなされな
ければならない。さらに、(v)当事者が事前に書面で相手方の同意を得ることなく、
本 NDA による権利と義務を帰すことができないという条件のもとで、当事者とそ
の継承者並びに被譲渡人に義務を課すものでなくてはならない。当事者はいかな
る事由においても、本 NDA に基づいて他者の代理として訴訟を起こしたり、訴訟
の権限を有してはならない。法廷での訴訟の判決により本 NDA のいかなる条項が
非強要性、無効性となっても、本 NDA の他の条項がそれに伴って非強要、無効に
なることがあってはならない。変更や訂正が当事者によって書面でなされ、署名
されない限り、本 NDA の変更、訂正は無効であり、当事者に義務を負わすことが
できない。変更される部分について当事者によって書面でなされ、署名されない
限り、本 NDA のいかなる条項の破棄も強制力を有することはない。

4

前記発効日に基づき、三者は合意した証としてここに署名する。


_____           _____
平田 耕也                          テッド スノッドグラス
代表取締役社長 兼 CEO             代表取締役社長 兼 ＣＥＯ
平田機工株式会社                    FAS テクノロジーズ　Ltd.


                                  _____
                                  マイク 岩方
                                  代表取締役社長
                                  FAS- アジア Ltd.


5

Yasunari Hirata
President and Representative Director
Hirata Corporation

Ted Snodgrass
Corporate President and CEO
FAS Technologies, Ltd.

Mike Iwakata
President and Representative Director
FAS Asia Ltd.

**EXHIBIT B:**

**Business Venture Agreement ("BVA"), June 30, 2001**

## BUSINESS VENTURE AGREEMENT

THIS BUSINESS VENTURE AGREEMENT (hereinafter referred to as "AGREEMENT"), made and entered into on June 30, 2001 between Hirata Corporation, having its principal offices at 3-9-20, Togoshi, Shinagawa-ku, Tokyo 142-0041, Japan (hereinafter referred to as "HIRATA") and FAS Technologies, Ltd., together with FAS Asia Ltd., a wholly owned subsidiary, having its principal offices at 10480 Markison Road, Dallas, Texas 75238, U.S.A.(hereinafter referred to as "FAS").

WHEREAS HIRATA has long time experience and knowledge in robotic automated process systems through developing, manufacturing and selling Flat Panel Display ("FPD") process and automation equipment, and through developing, manufacturing and selling semiconductor Wafer ("WAFER") process and automation equipment, and wishes to work with FAS to jointly develop, manufacture and integrate industry leading, state-of-the-art coating and related process equipment; and

WHEREAS FAS has long time experience and knowledge in precision dispensing, extrusion coating, developing and baking process equipment through developing, manufacturing and selling Flat Panel Display, High Density Interconnect and Wafer process equipment using FAS patented and proprietary extrusion technologies, and wishes to work with HIRATA to jointly develop more advanced extrusion coating and related process equipment and integrate its products into an automated system to manufacture and sell under collaboration relationship with HIRATA; and

NOW, THEREFORE, the parties undersigned hereto agree as follows:

## 1. Definitions

1.1.    Following are definitions to be used in this AGREEMENT, JD PROGRAM and NDA, however some specific definitions may only be used for each document attached hereto.

1.2.    JOINT DEVELOPMENT PROGRAM ("JD PROGRAM") means the

development program made between the parties on the same day as the AGREEMENT, to develop advanced products between the parties and attached hereto as a part of the AGREEMENT.

1.3.    NON DISCLOSURE AGREEMENT ("NDA") means the agreement made and entered into the same day as this AGREEMENT for the parties to keep information provided by the other party confidential from third parties and attached hereto as a part of the AGREEMENT.

1.4.    SUBSIDIARY means any corporation, company or other entity with respect to which a party hereto owns or controls more than fifty percent (50%) of its outstanding ownership shares or units, conferring the right to vote at general meetings.

1.5.    FIELDS OF USE means the application or use of the equipment or technology to include only, Flat Panel Displays ("FPD"), High Density Interconnect ("HDI"), Micro-Electro-Mechanical Systems ("MEMS") and traditional semiconductor wafer coating applications ("WAFER").

1.6.    MH COATER MODULE ("MH") means a current generation stand-alone extrusion coater with moving head and detachable fluid cart developed by FAS for coating chemicals on a large area substrate without spin.

1.7.    MicroE COATER MODULE ("MicroE") means a current generation stand-alone extrusion coater developed by FAS with moving head for coating chemicals on a small square substrate or wafer with or without spin.

1.8.    LINEAR DEVELOPER MODULE ("LD") means a stand-alone developer which is a FAS patented apparatus using a linear extrusion nozzle to dispense developer fluid onto an entire large area substrate surface, with or without spin.

1.9.    MICRO LINEAR DEVELOPER MODULE ("MicroLD") means a stand-alone developer which is a FAS patented apparatus using a linear extrusion nozzle to dispense developer fluid onto an entire substrate surface and adapted to be compatible with the MicroE and generally intended for small square or wafer type substrates, with or without spin.

1.10.     HOT PLATE CHILL PLATE MODULE ("HPCP") means a stand-alone unit for baking or chilling substrates before or after coating, developing or other process steps and adapted for the substrate size and process requirements.

1.11.     NEXT GENERATION HOT PLATE CHILL PLATE MODULE ("NEXT GEN HPCP") means a new HPCP module that is improved and developed under the JD PROGRAM between the parties.

1.12.     NEXT GENERATION LINEAR DEVELOPER MODULE ("NEXT GEN LD") means a new LD module that is improved and developed under the JD PROGRAM between the parties.

1.13.     NEXT GENERATION MICRO LINEAR DEVELOPER MODULE ("NEXT GEN MicroLD") means a new MicroLD module that is improved and developed under the JD PROGRAM between the parties.

1.14.     NEXT GENERATION MH EXTRUSION COATER ("NEXT GEN MH") means a new MH module that is improved and developed under the JD PROGRAM between the parties.

1.15.     NEXT GENERATION MICRO EXTRUSION COATER MODULE ("NEXT GEN MicroE") means a new MicroE module that is improved and developed under the JD PROGRAM between the parties.

1.16.     AUTOMATION WORK CELL FOR LARGE AREA SUBSTRATES ("LAS WORK CELL") means custom developed robotics, environmental enclosure and integrated system control software for providing integration, control and automation of modules such as the MH, LD, HPCP, NEXT GEN MH, NEXT GEN LD and NEXT GEN HPCP and other custom products all intended primarily for large substrates, such as FPD and HDI.

1.17.     AUTOMATION WORK CELL FOR WAFER SUBSTRATES ("WAFER WORK CELL") means custom developed robotics, environmental enclosure and integrated system control software for providing integration, control and automation of modules such as the MicroE, MicroLD, HPCP, NEXT GEN MicroE,

NEXT GEN MicroLD and NEXT GEN HPCP and other custom products all intended primarily for small square and wafer substrates such as semiconductor related process.

1.18.   HIRATA PRODUCTS means all products HIRATA has been manufacturing and selling for FPD and WAFER applications before signing of the AGREEMENT and not considered as being developed under the JD PROGRAM.

1.19.   FAS PRODUCTS means all products FAS has been manufacturing and selling for FPD, HDI and WAFER applications before signing of the AGREEMENT and not considered as being developed under the JD PROGRAM.

1.20.   INTEGRATED LAS SYSTEM means an automated process tool integrating the LAS WORK CELL and one or more appropriate process modules, such as the MH and NEXT GEN MH.

1.21.   INTEGRATED WAFER SYSTEM means an automated process tool integrating the WAFER WORK CELL and one or more appropriate process modules, such as the MicroE and NEXT GEN MicroE.

1.22.   SPECIFIED TERRITORY means Asia including Japan for HIRATA and North America and Europe for FAS.

1.23.   UNSPECIFIED TERRITORY means the Rest Of the World ("ROW") other than Asia or North America.

1.24.   THE PRODUCTS means current and next generation products and modules as defined above.

1.25.   OTHER PRODUCTS AND PROCESS MODULES ("OTHER PRODUCTS") means any other apparatus, component, subsystem, super-system (including factory control software), not specifically defined elsewhere in this AGREEMENT.

## 2. Exhibits

As a part of the AGREEMENT, the parties shall make the JD PROGRAM and enter into the NDA of which are made part of and are attached to the AGREEMENT as Exhibit A and Exhibit B hereto respectively. Both parties agree that NDA shall be dated as of April 1, 2001 when both parties started to discuss business opportunity and technical issues.

## 3.  Immediate Activities with Current Products

3.1.    Under the AGREEMENT, both parties shall exchange technical personnel and information to openly review and evaluate the technology, patents, customers, performance and overall capabilities of each company ("EVALUATION").

3.2.    Based on the above EVALUATION, the parties shall define a program to make limited improvements and substantially utilize the extrusion coating technology of FAS and the automation technology of Hirata.  The result of this program shall be to make an initial offering of automated extrusion coating systems and make these systems available for sale to end customers by a target date of January 1, 2002.

3.3.    In general it is expected that FAS will provide the MH, MicroE and HPCP with minor improvements to each as may be mutually agreed as necessary for successful continued sales and marketing activitity, and Hirata will provide the custom designed LAS WORK CELL and WAFER WORK CELL.

## 4.  Joint Development Program for Next Generation Products

4.1.    Under the AGREEMENT, both parties shall define a mutually agreeable JD PROGRAM in writing, to develop the PRODUCTS incorporated with OTHER PRODUCTS.  A detailed program schedule shall be discussed and agreed by and between the parties within 30 days of the signing of the AGREEMENT and modified from time to time as the program progresses by mutual consent in writing.

4.2.    Both parties shall not engage in substantially the same joint development work as stipulated in the JD PROGRAM under the AGREEMENT with third party

in the other party's territory. If such development work is necessary, a party shall inform the other party and obtain consent in writing. A party is so requested shall not withhold its consent unreasonably.

## 5. Manufacturing and Supply of Products

5.1.     It is initially anticipated and to be confirmed by the EVALUATION that HIRATA will begin non-exclusive manufacturing of the MH, and shall be granted an exclusive right to manufacture HPCP (for large substrates only), NEXT GEN MH, NEXT GEN LD, LAS WORK CELL, WAFER WORK CELL and INTEGRATED LAS SYSTEM, except that FAS shall also retain a right to manufacture these items.

5.2.     It is initially anticipated and to be confirmed by the EVALUATION that FAS will begin exclusive manufacturing of the MicroE, MicroLD, HPCP (for small and wafer substrates only) and NEXT GEN MicroLD.  HIRATA and FAS shall each be granted a non-exclusive license to manufacture INTEGRATED WAFER SYSTEM.

5.3.     Both parties agree to discuss and modify as mutually agreed from time to time the best party and location to perform manufacturing and other related activities, based on the location of the end customer, costs and other factors as may be appropriate to establish the most beneficial arrangement.

5.4.     Both parties shall supply some key components and/or sub-assembly to each other as necessary to manufacture products developed under JD PROGRAM if the other party so requests.

5.5.     Manufacturing of products that are not subject to the JD PROGRAM outside of each manufacturing territory shall not be restricted by the other party at its own facility or any third party facility, unless other wise agreed by the parties separately in writing. However, both parties shall discuss in good faith if such activities may create competition between the parties, and find the best structure for the mutual interests of both parties.

5.6.     FAS and Hirata shall objectively evaluate the use of third party suppliers for certain manufacturing, and supply of components and subsystems, based on

economics and other criteria.  Such evaluation shall include the evaluation of additional integration or services of Shimadzu Corporation, beyond just sales of the PRODUCTS in Japan.

## 6. Collaboration

6.1.      Both parties shall collaborate with each other to best utilize its resources for the program, development, manufacture, sale and service of the products resulting from the JD PROGRAM to position the parties in a highly competitive business within the industries.

6.2.      Both parties shall immediately begin discussions of the best way to fairly establish revenue and economic benefit to each party.  Such discussions shall include, but not be limited to the formation of Joint Venture Companies ("JV COMPANIES") in the United States and in Japan and joint investment in the JV COMPANIES.

6.3.      In relation to the mutual objectives defined herein, HIRATA and FAS shall discuss in good faith and agree upon the appropriate allocation of costs and methods of funding activities related to the next generation products.

6.4.      In consideration of the benefits derived from this relationship, and further to provide for increased capabilities of FAS to support the objectives of this Agreement, HIRATA will consider, separately from this Agreement, an investment in FAS.

## 7. Sell and Purchase of FAS PRODUCTS for the JD PROGRAM

For the purpose of joint development work under the JD PROGRAM, HIRATA shall be able to purchase a model MH700 and a model MicroE 200 from FAS and FAS agrees to supply such equipment at reduced price.  The final price and terms for each system shall be negotiated and agreed by the parties and such purchase shall occur within a reasonable time period following the signing of the AGREEMENT.  Both parties agree that only a preliminary specification shall be required at the time of this purchase and to be followed as soon a practical thereafter with a final specification through joint discussions and collaboration.

## 8. Marketing and Sales

8.1.　　Shimadzu Corporation ("SHIMADZU") shall have the right to sell the current and next generation extrusion coaters in Japan only for the duration and in accordance with the Exclusive Sales Agreement between FAS and SHIMADZU, which shall expire on March 31, 2003.   SHIMADZU's right to sell shall be contingent upon their adequate performance in the mutual opinion of FAS and HIRATA, provided that the performance and efforts to cooperate with SHIMADZU shall have a reasonable best effort by the parties. The final relationship between the parties related to this exclusive sales right shall be discussed among the parties to clarify and agree before signing definitive agreement between Hirata and FAS.

8.2.　　HIRATA and FAS agree to sell THE PRODUCTS in their SPECIFIED TERRITORY; except, such sales rights shall not violate the sales rights of SHIMADZU. Each party further agrees to provide reasonable assistance and cooperation with the other party for mutual success, regardless of territory.

8.3.　　HIRATA and FAS shall jointly discuss and mutually collaborate to promote both companies' product name and presence for sales, service and marketing in the SPECIFIED TERRITORY and in the UNSPECIFIED TERRITORY.

## 9. Cross Licensing of Patent Technologies

9.1.　　Each party shall grant its non-exclusive patent rights to the other without compensation so long as it is used only for the purpose of the AGREEMENT and JD PROGRAM.

9.2.　　New patents, intellectual property and know-how developed during the term of the AGREEMENT, under the JD PROGRAM and related to THE PRODUCTS, collectively ("NEW IP") shall be jointly owned and available to be freely used, only as defined in this AGREEMENT. Such joint ownership and rights of the NEW IP shall survive the termination of this agreement; however, such survival of rights shall not diminish the value or provide a license to make, use or

---

sell any products of any nature covered by existing patents or intellectual property held by each party prior to signing the AGREEMENT, upon the termination of this AGREEMENT, whether through natural expiration or for cause.

## 10. Terms and Termination

10.1.    This AGREEMENT shall be effective for three years from the date first executed and renewed thereafter for every two years upon mutual   consent. However, NDA dated April 1, 2001 shall be executed by the parties and survive for the duration of such NDA term.

10.2.    Not withstanding the above, either party can terminate the AGREEMENT due to the following event(s) without prior notice.

10.2.1.   In the event of any breach of any of the provisions of this AGREEMENT, and such breach is not remedied within sixty (60) days from the date after the same shall have been brought to the attention of the breaching party in writing by the non breaching party.

10.2.2.   In the event that either party should file a petition of bankruptcy or make a general assignment for the benefit of creditors or otherwise acknowledge insolvency, or be adjudged bankrupt, or should go or be placed into a process of complete liquidation other than for an amalgamation or reconstruction.

## 11. Assignment and Transfer of the AGREEMENT

Neither party shall assign nor transfer this AGREEMENT to any third party without written consent from the other party in advance.  Parties may assign its obligation or responsibility to its own SUBSIDIARY who will take the same responsibility or obligation as such a party.

## 12. Protection of Intellectual Property Rights

12.1.    Both parties agree to promptly notify in writing each other when it becomes aware of any infringement or misappropriation of intellectual property related to this AGREEMENT owned by either party. Each party shall collaborate with the other party to prevent or stop such infringement or misappropriation

through either negotiation with such third party or necessary legal action. Any cost incurred shall be shared between the parties based on fair judgment of benefit for each party.

12.2.　　　Both parties shall cooperate fully to seek patent protection, along with maintaining trade secrets where appropriate and to pursue such protection under mutually agreed terms.　In general, the costs of patent applications and maintenance resulting from the JD PROGRAM shall be equally shared between the parties.

## 13. Force Majeure

13.1.　　　Either party shall not be liable for delay of performance or breach of liability under this AGREEMENT if such delay or breach is caused by act of God, war, fire, flood, strike or sabotage of transportation means, government regulation or any other causes beyond a party's control.

13.2.　　　In case of any occurrence of force majeure resulting breach or delay of performance, the party who suffered from such occurrence shall forthwith notify the other party in writing of the date that had happened, description and expected period of abnormal situation, and shall take all conceivable measures to minimize the breach or non-performance.

## 14. Notice

All notices under this AGREEMENT shall be made in writing by telefax or certified mail to:

If to FAS:　　10480 Markison Road, Dallas, Texas 75238, U.S.A.
Attn: Mr. Ted Snodgrass, President and CEO
FAS Technologies, Ltd.

If to HIRATA:　　3-9-20, Togoshi, Shimagawa-ku,
Tokyo 142-0041, Japan
Attn:.Mr. Yasunari Hirata, President and Representative Director

---

Hirata Corporation

## 15. Entire Agreement

15.1.      This AGREEMENT, together with its exhibits, as referenced herein and made part of this AGREEMENT, including, but not limited to the NDA, represents the entire agreement as to the subject matter among the parties hereof, and supersedes prior agreements, whether written or oral.

15.2.      The parties understand that this AGREEMENT is not intended as the final and complete documentation of the entire relationship contemplated herein, and the parties agree to work together in good faith for immediate actions and to concurrently develop a more comprehensive definitive agreement to supercede this AGREEMENT, the ("DEFINITIVE AGREEMENT"). The parties will use their best reasonable efforts to complete the DEFINITIVE AGREEMENT before October 1, 2001.

## 16. Dispute and Governing Law

In the event of any dispute between the parties arising from the execution of or in connection with this AGREEMENT, the parties shall exert their best efforts for good faith negotiation to amicably settle such dispute. To the extent the parties are not able to amicably resolve the dispute, the dispute shall be resolved according to the rules of the International Arbitration Association. Any arbitration action taken by HIRATA against FAS shall be conducted in Dallas Texas, U.S.A., and any action taken by FAS against HIRATA shall be conducted in Tokyo, Japan. This AGREEMENT shall be governed by and construed in accordance with the substantive laws of Japan.

Yasunari Hirata
President and Representative Director
Hirata Corporation

Ted Snodgrass
Corporate President and CEO
FAS Technologies, Ltd.

Mike Iwakata
President and Representative Director
FAS Asia Ltd.

APP.24

# EXHIBIT C:

**Additional Non-Disclosure Agreement ("Additional NDA"), October 30, 2001**

## NON-DISCLOSURE AGREEMENT

This Agreement made and entered into as of *October*, *30*, 2001, among Hirata Corporation, having its principal offices at 8-9-20, Togoshi, Shinagawa-ku, Tokyo 142-0041, Japan(hereinafter called "Hirata"),

FAS Technologies, Ltd., including its wholly owned subsidiary FAS Asia Ltd., having its principal offices at 10480 Markison Road, Dallas Texas 75238, U.S.A.(hereinafter called "FAS"),and

Shimadzu Corporation having its principal offices at 1 Nishinokyo-Kuwabaracho, Nakagyo-ku, Kyoto 604-8511, Japan (hereinafter called "Shimadzu");

### WITNESSETH THAT:

WHEREAS, Hirata, FAS and Shimadzu (hereinafter called "Parties") intend to engage in discussions for the Purpose set forth below, and in the course of such discussions it is anticipated that either party may disclose commercial and technical information, which is proprietary to the disclosing party or parties (hereinafter called "Discloser") and which relate to the Products and/or Technology set forth below (hereinafter called "Proprietary Information");

the Products and/or Technology:

> Current and new extrusion coating equipment and technology, and its related process and automation equipment and technology

the Purpose:

> Evaluation of establishing a business relationship concerning development, manufacture, sale and marketing of the Product and/or Technology

NOW, THEREFORE, in order to protect unauthorized use and dissemination by the party or parties which receive Proprietary Information(hereinafter called "Recipient"), the Parties mutually agree as follows:

1.     PROPRIETARY INFORMATION

Proprietary Information shall be identified as proprietary, confidential or secret with an appropriate legend or marking on each document disclosed.   If Proprietary Information is orally disclosed, it shall be clearly announced and identified as such at the time of the disclosure.

2.     PROTECTION AND USE

2.1     Recipient agrees that Recipient shall not, without the prior written consent of Discloser, disclose Proprietary Information or any portion thereof to any person or entity nor use for any purpose other than the Purpose. Recipient also agrees that it shall make Proprietary Information available only to its employees having a "need to know" with respect to the Purpose.

2.2     Proprietary Information disclosed in writing and all copies thereof shall, if directed by Discloser, be returned to Discloser, except the archival of one copy.

3.     EXCLUSIONS FROM PROTECTION

The obligations specified in Section 2 above shall not apply to any information:

(a) which at the time of disclosure is in the public domain;

(b) which after disclosure becomes part of the public domain through no fault of Recipient;

(c) which prior to the time of disclosure has been developed independently by Recipient as shown by its written records;

(d) which prior to the time of disclosure has been lawfully acquired from a third party having the right to disclose it ;

(e) which may be subsequently lawfully acquired from a third party having the right to disclose it; or

(f) which may be subsequently developed independently by Recipient as shown by its written records.

4.     INVENTION

If Recipient shall make any invention or improvement based upon the other party's Proprietary Information, it shall inform the other party in writing of that effect at once, and the Parties shall discuss with each other the possession of such invention or improvement.

5.    NO ADDITIONAL RIGHT GRANTED

Nothing in this Agreement shall be construed as granting or conferring any rights to Recipient by license or otherwise, expressly or implied, to any invention or discovery, or to any patent covering such invention or discovery.

6.    TERM

This Agreement shall expire six (6) months after the date first above written in this Agreement except that it may be terminated earlier by thirty (30) days' prior written notification of either party to the other or extended by mutual written agreement.   The provisions of Section 2 above shall survive such expiration or termination for five (5) years.

7.    APPLICABLE LAW

This Agreement shall be governed by and interpreted in accordance with the laws of Japan.

8.    ARBITRATION

In the event of any question, dispute or difference among the Parties arising out of or in connection with this Agreement, the Parties shall use their best efforts to settle such question, dispute or difference amicably. If not amicably settled such question, dispute or difference shall be finally settled exclusively by arbitration, which shall be held at the city of the defendant's principal office pursuant to the Rules of the International Court of Arbitration, International Chamber of Commerce. The arbitration award shall be final, and the Parties agree to be bound thereby.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers or representatives as of the day and year first above written.

by: _____

Teruyasu   Shimozu
Director, General Manager
Hirata Corporation

by: _____

Ted Snodgrass
President and Chief Executive Officer
FAS Technologies, Ltd.

by: _____

Mike   Iwakata
President
FAS Asia Ltd.

by: _____

Mikio   Joh
Executive Deirector and
General Manager of
Industrial Machinery Division
Shimdzu Corporation

**EXHIBIT D:**

**Definitive Business Venture Agreement ("DBVA"),
October 30, 2001**

# DEFINITIVE BUSINESS VENTURE AGREEMENT

THIS DEFINITIVE BUSINESS VENTURE AGREEMENT (hereinafter referred to as "AGREEMENT"), made and effective on October 30, 2001 between Hirata Corporation, having its principal offices at 3-9-20, Togoshi, Shinagawa-ku, Tokyo 142-0041, Japan (hereinafter referred to as "HIRATA") and FAS Technologies, Ltd., together with FAS Asia Ltd., a wholly owned subsidiary, having its principal offices at 10480 Markison Road, Dallas, Texas 75238, U.S.A. (hereinafter referred to as "FAS").

WHEREAS HIRATA has long time experience and knowledge in robotic automated process systems through developing, manufacturing and selling Flat Panel Display ("FPD") process and automation equipment, and through developing, manufacturing and selling semiconductor Wafer ("WAFER") process and automation equipment, and wishes to work with FAS to jointly develop, manufacture and integrate industry leading, state-of-the-art coating and related process equipment; and

WHEREAS FAS has long time experience and knowledge in precision dispensing, extrusion coating, developing and baking process equipment through developing, manufacturing and selling Flat Panel Display, High Density Interconnect and Wafer process equipment using FAS patented and proprietary extrusion technologies, and wishes to work with HIRATA to jointly develop more advanced extrusion coating and related process equipment and integrate its products into an automated system to manufacture and sell under collaboration relationship with HIRATA; and

NOW, THEREFORE, the parties undersigned hereto agree as follows:

## 1. Definitions

1.1.     Following are definitions to be used in this AGREEMENT, JD PROGRAM and NDA, however some specific definitions may only be used for each document attached hereto.

1.2.     JOINT DEVELOPMENT PROGRAM ("JD PROGRAM") means the development program made between the parties on the same day as the AGREEMENT, to develop advanced products between the parties and attached



hereto as a part of the AGREEMENT.

1.3.    NON DISCLOSURE AGREEMENT ("NDA") means the agreement made and entered into the same day as this AGREEMENT for the parties to keep information provided by the other party confidential from third parties and attached hereto as a part of the AGREEMENT.

1.4.    SUBSIDIARY means any corporation, company or other entity with respect to which a party hereto owns or controls more than fifty percent (50%) of its outstanding ownership shares or units, conferring the right to vote at general meetings.

1.5.    FIELDS OF USE means the application or use of the equipment or technology to include only, Flat Panel Displays ("FPD"), High Density Interconnect ("HDI"), Micro-Electro-Mechanical Systems ("MEMS") and traditional semiconductor wafer coating applications ("WAFER").

1.6.    MH™ COATER MODULE ("MH") means a current generation stand-alone extrusion coater with moving head and detachable fluid cart developed by FAS for coating chemicals on a large area substrate without spin.

1.7.    MicroE™ COATER MODULE ("MicroE") means a current generation stand-alone extrusion coater developed by FAS with moving head for coating chemicals on a small square substrate or wafer with or without spin.

1.8.    LINEAR DEVELOPER MODULE ("LD") means a stand-alone developer which is a FAS patented apparatus using a linear extrusion nozzle to dispense developer fluid onto an entire large area substrate surface, with or without spin.

1.9.    MICRO LINEAR DEVELOPER MODULE ("MicroLD") means a stand-alone developer which is a FAS patented apparatus using a linear extrusion nozzle to dispense developer fluid onto an entire substrate surface and adapted to be compatible with the MicroE and generally intended for small square or wafer type substrates, with or without spin.

automation of modules such as the MicroE, MicroLD, HPCP, NEXT GEN MicroE™, NEXT GEN MicroLD and NEXT GEN HPCP and other custom products all intended primarily for small square and wafer substrates such as semiconductor related process.

1.18.    HIRATA PRODUCTS means all products HIRATA has been manufacturing and selling for FPD and WAFER applications before signing of the AGREEMENT and not considered as being developed under the JD PROGRAM.

1.19.    FAS PRODUCTS means all products FAS has been manufacturing and selling for FPD, HDI and WAFER applications before signing of the AGREEMENT and not considered as being developed under the JD PROGRAM.

1.20.    INTEGRATED LAS SYSTEM means an automated process tool integrating the LAS WORK CELL and one or more appropriate process modules, such as the MH and NEXT GEN MH™.

1.21.    INTEGRATED WAFER SYSTEM means an automated process tool integrating the WAFER WORK CELL and one or more appropriate process modules, such as the MicroE and NEXT GEN MicroE™.

1.22.    SPECIFIED TERRITORY means Asia including Japan for HIRATA and North America and Europe for FAS.

1.23.    UNSPECIFIED TERRITORY means the Rest Of the World ("ROW") other than Asia or North America.

1.24.    THE PRODUCTS means current and next generation products and modules as defined above.

1.25.    OTHER PRODUCTS AND PROCESS MODULES ("OTHER PRODUCTS") means any other apparatus, component, subsystem, super-system (including factory control software), not specifically defined

1.10.   HOT PLATE CHILL PLATE MODULE ("HPCP") means a stand-alone unit for baking or chilling substrates before or after coating, developing or other process steps and adapted for the substrate size and process requirements.

1.11.   NEXT GENERATION HOT PLATE CHILL PLATE MODULE ("NEXT GEN HPCP") means a new HPCP module that is improved and developed under the JD PROGRAM between the parties.

1.12.   NEXT GENERATION LINEAR DEVELOPER MODULE ("NEXT GEN LD") means a new LD module that is improved and developed under the JD PROGRAM between the parties.

1.13.   NEXT GENERATION MICRO LINEAR DEVELOPER MODULE ("NEXT GEN MicroLD") means a new MicroLD module that is improved and developed under the JD PROGRAM between the parties.

1.14.   NEXT GENERATION MH™ EXTRUSION COATER ("NEXT GEN MH") means a new MH™ module that is improved and developed under the JD PROGRAM between the parties including Dual Head MHN, Cart Type MHN and MSN models as described in the attached JOINT DEVELOPMENT PROGRAM.

1.15.   NEXT GENERATION MICRO EXTRUSION COATER MODULE ("NEXT GEN MicroE") means a new MicroE module that is improved and developed under the JD PROGRAM between the parties.

1.16.   AUTOMATION WORK CELL FOR LARGE AREA SUBSTRATES ("LAS WORK CELL") means custom developed robotics, environmental enclosure and integrated system control software for providing integration, control and automation of modules such as the MH™, LD, HPCP, NEXT GEN MH, NEXT GEN LD and NEXT GEN HPCP and other custom products all intended primarily for large substrates, such as FPD and HDI.

1.17.   AUTOMATION WORK CELL FOR WAFER SUBSTRATES ("WAFER WORK CELL") means custom developed robotics, environmental enclosure and integrated system control software for providing integration, control and



elsewhere in this AGREEMENT.

## 2. Exhibits

As a part of the AGREEMENT, the parties shall make the JD PROGRAM and enter into the NDA of which are made part of and are attached to the AGREEMENT as Exhibit A and Exhibit B hereto respectively. Both parties agree that NDA shall be dated as of April 1, 2001 when both parties started to discuss business opportunity and technical issues.

## 3. Joint Development Program

3.1.    Under the AGREEMENT, both parties shall immediately start joint development work stipulated in the JD PROGRAM to develop the PRODUCTS incorporated with OTHER PRODUCTS.    A detailed schedule of the JD PROGRAM shall be   reviewed and modified as necessary from time to time as the program progresses by mutual consent in writing.

3.2.    Both parties shall not engage in substantially the same joint development work as stipulated in the JD PROGRAM under the AGREEMENT with third party in the other party's territory. If such development work is necessary, a party shall inform the other party and obtain consent in writing. A party is so requested shall not withhold its consent unreasonably.

## 4. Manufacturing and Supply of Products

4.1.    It is initially anticipated and to be confirmed by the EVALUATION that HIRATA will begin non-exclusive manufacturing of the MH, and shall be granted an exclusive right to manufacture HPCP (for large substrates only), NEXT GEN MH™, NEXT GEN LD, LAS WORK CELL, WAFER WORK CELL and INTEGRATED LAS SYSTEM, except that FAS shall also retain a right to manufacture these items.

4.2.    It is initially anticipated and to be confirmed by the EVALUATION that FAS will begin exclusive manufacturing of the MicroE™, MicroLD, HPCP (for small




and wafer substrate only), NEXT GEN MicroE™ and NEXT GEN MicroLD. HIRATA and FAS shall each be granted a non-exclusive license to manufacture INTEGRATED WAFER SYSTEM.

4.3.     Both parties agree to discuss and modify if necessary once a year by mutual consent. the best party and location to perform manufacturing and other related activities, based on the location of the end customer, costs and other factors as may be appropriate to establish the most beneficial arrangement.

4.4.     Both parties shall supply some key components and/or sub-assembly to each other as necessary to manufacture products developed under JD PROGRAM if the other party so requests at the cost plus reasonable profit.

4.5.     Manufacturing of products that are not subject to the JD PROGRAM outside of each manufacturing territory shall not be restricted by the other party at its own facility or any third party facility, unless otherwise agreed by the parties separately in writing. However, both parties shall discuss in good faith if such activities may create competition between the parties, and find the best structure for the mutual interests of both parties.

4.6.     FAS and Hirata shall objectively evaluate the use of third party suppliers for certain manufacturing, and supply of components and subsystems, based on economics and other criteria.

5.     **Collaboration**

5.1.     Both parties shall collaborate with each other to best utilize its resources for the program, development, manufacture, sale and service of the products resulting from the JD PROGRAM to position the parties in a highly competitive business within the industries.

5.2.     Both parties shall continue to discuss a possibility of the formation of Joint Venture Companies ("JV COMPANIES") in the United States and in Japan and joint investment in the JV COMPANIES to study the best way to fairly establish revenue and economic benefit to each party for the future. It is agreed to set a



APP.36

goal to reach initial stage of such JV COMPANIES within one year from the date of signing of the AGREEMENT.

5.3.  In relation to the mutual objectives defined herein, HIRATA and FAS shall discuss in good faith and agree upon the appropriate allocation of costs and methods of funding activities related to the next generation products.

5.4.  In consideration of the benefits derived from this relationship, and further to provide for increased capabilities of FAS to support the objectives of this Agreement, HIRATA will consider, separately from this Agreement, an investment in FAS.

## 6. Sell and Purchase of FAS PRODUCTS for the JD PROGRAM

For the purpose of joint development work under the JD PROGRAM, HIRATA shall be able to purchase a model MH700 and a model MicroE 200 from FAS and FAS agrees to supply such equipment at reduced price.  The final price and terms for each system shall be negotiated and agreed by the parties and such purchase negotiations shall be started at the earliest possible time following the signing of the AGREEMENT.  Both parties agree that only a preliminary specification shall be required at the time of this purchase and to be followed as soon a practical thereafter with a final specification through joint discussions and collaboration.

## 7. Marketing and Sales

7.1.  HIRATA and FAS agree to sell THE PRODUCTS in their SPECIFIED TERRITORY. Each party further agrees to provide reasonable assistance and cooperation with the other party for mutual success, regardless of territory.

7.2.  HIRATA and FAS shall jointly discuss and mutually collaborate to promote both companies' product name and presence for sales, service and marketing in the SPECIFIED TERRITORY and in the UNSPECIFIED TERRITORY.

## 8. Cross Licensing of Patent Technologies

8.1.  Each party shall grant its non-exclusive patent rights to the other without

compensation so long as it is used only for the purpose of the AGREEMENT and JD PROGRAM.

8.2.    New patents, intellectual property and know-how developed during the term of the AGREEMENT, under the JD PROGRAM and related to THE PRODUCTS, (collectively "NEW IP") shall be jointly owned

8.2.1.    Either party may neither transfer its share nor establish a pledge upon the NEW IP without the consent of the other party.

8.3.    Either party may use the NEW IP without the consent of the other party. Provided, however, that either party may neither establish an exclusive license for the NEW IP nor grant a non-exclusive license to a third party without the consent of the other party.

8.4.    Such joint ownership and rights of the NEW IP shall survive the termination of this AGREEMENT; however, such survival of rights shall not diminish the value of a license or provide a license to make, use or sell any products of any nature covered by existing patents or intellectual property held by each party prior to signing the AGREEMENT, upon the termination of this AGREEMENT, whether through natural expiration or for cause.

9.    **Terms and Termination**

9.1.    This AGREEMENT shall be effective for three years from the date first executed and renewed thereafter for every two years upon mutual consent. However, NDA dated April 1, 2001 shall be executed by the parties and survive for the duration of such NDA term.

9.2.    Notwithstanding the above, either party may terminate the AGREEMENT due to the following event(s) without prior notice.

9.2.1.    In the event of any breach of any of the provisions of this AGREEMENT, and such breach is not remedied within sixty (60) days from the date after the same shall have been brought to the attention of the breaching party in writing by



the non breaching party.

9.2.2.     In the event that either party should file a petition of bankruptcy or make a general assignment for the benefit of creditors or otherwise acknowledge insolvency, or be adjudged bankrupt, or should go or be placed into a process of complete liquidation other than for an amalgamation or reconstruction.

## 10. Assignment and Transfer of the AGREEMENT

Neither party shall assign nor transfer this AGREEMENT to any third party without written consent from the other party in advance.   Parties may assign its obligation or responsibility to its own SUBSIDIARY who will take the same responsibility or obligation as such a party.

## 11. Protection of Intellectual Property Rights

11.1.     Both parties agree to promptly notify in writing each other when it becomes aware of any infringement or misappropriation of intellectual property related to this AGREEMENT owned by either party. Each party shall collaborate with the other party to prevent or stop such infringement or misappropriation through either negotiation with such third party or necessary legal action. Any cost incurred shall be shared between the parties based on fair judgment of benefit for each party.

11.2.     Both parties shall cooperate fully to seek patent protection, along with maintaining trade secrets where appropriate and to pursue such protection under mutually agreed terms.   In general, the costs of patent applications and maintenance resulting from the JD PROGRAM shall be equally shared between the parties.

## 12. Force Majeure

12.1.     Either party shall not be liable for delay of performance or breach of liability under this AGREEMENT if such delay or breach is caused by act of God, war, fire, flood, strike or sabotage of transportation means, government regulation



or any other causes beyond a party's control.

12.2.    In case of any occurrence of force majeure resulting breach or delay of performance, the party who suffered from such occurrence shall forthwith notify the other party in writing of the date that had happened, description and expected period of abnormal situation, and shall take all conceivable measures to minimize the breach or non-performance.

## 13. Notice

All notices under this AGREEMENT shall be made in writing by telefax or certified mail to:

> If to FAS:        10480 Markison Road, Dallas, Texas 75238, U.S.A.
> Attn: Mr. Ted Snodgrass, President and CEO
> FAS Technologies, Ltd.

> If to HIRATA:     3-9-20, Togoshi, Shimagawa-ku,
> Tokyo 142-0041, Japan
> Attn: Mr. Yasunari Hirata, CEO
> Hirata Corporation

## 14. Entire Agreement

14.1.    This AGREEMENT, together with its exhibits, as referenced herein and made part of this AGREEMENT, including, but not limited to the NDA, represents the entire agreement as to the subject matter among the parties hereof, and supersedes prior agreements, whether written or oral including the preliminary BUSINESS VENTURE AGREEMENT signed by the parties on July 12, 2001.

14.2.    This AGREEMENT may be modified or amended as necessary by the parties through mutual consent in writing. Any modification or amendment shall be singed by the parties and shall be attached and considered to be a part of this AGREEMENT.

## 15. Dispute and Governing Law

In the event of any dispute between the parties arising from the execution of or in connection with this AGREEMENT, the parties shall exert their best efforts for good faith negotiation to amicably settle such dispute. To the extent the parties are not able to amicably resolve the dispute, the dispute shall be resolved according to the rules of the International Chamber of Commerce. Any arbitration action taken by HIRATA against FAS shall be conducted in Dallas Texas, U.S.A., and any action taken by FAS against HIRATA shall be conducted in Tokyo, Japan. This AGREEMENT shall be governed by and construed in accordance with the substantive laws of Japan.

Date: OCT.30.2001

Yasunari Hirata
CEO ∠ Representative Director
Hirata Corporation

Date: OCT 30, 2001

Ted Snodgrass
President and CEO of
FAS Holding Corporation
General Partner of
FAS Technologies, Ltd.

Date: Oct. 30, 2001

Mike Iwakata
President and Representative Director
FAS Asia Ltd.

APP.41

## EXHIBIT E:

**Memorandum of Understanding ("MOU"), January 21, 2004**

43

## MEMORANDUM OF UNDERSTANDING
### TECHNOLOGY ACCESS & DEVELOPMENT AGREEMENT
(for development of Extrusion Coating Systems for Tokyo Electron)

Hirata Corporation, including its subsidiaries and its affiliates, with main offices at 111 Hitotsugi, Ueki, Kamoto, Kumamoto 861-0198, Japan (hereinafter referred to as **"Hirata"**) and FAS Technologies, LLC., with main offices at 10480 Markison Road, Dallas, Texas 75238, U.S.A. (hereinafter referred to as "FAS" in this MEMORANDUM OF UNDERSTANDING (hereinafter referred to as **"this MOU"**) as of January 21, 2004 (hereinafter referred to as the **"Effective Date"**), agree that Hirata, with certain assistance from FAS, shall develop and manufacture photoresist coaters, utilizing a spinless extrusion method (such method hereinafter shall be referred to as "FAS-Coat<sup>TM</sup>"). FAS shall provide access for Hirata to the necessary technology for development and manufacture of the FAS-Coat coaters. Such technology provided by FAS shall include, but not be limited to, specialized subsystems and/or components, the necessary patents, copyrights, service marks, and know-how. The FAS-Coat coaters shall be for original equipment manufacturer (hereinafter referred to as "OEM") use only as specifically designated in this MOU. The Hirata FAS-Coat coaters shall be produced solely for OEM sale to Tokyo Electron, Limited (hereinafter referred to as "TEL"). It is further understood by the parties that TEL will integrate with other factory process equipment as may be necessary, the Hirata FAS-Coat coaters, and TEL shall actively pursue the marketing, sales and service of such final coating process equipment.

1. FAS represents it has the legal right to grant the rights defined in this MOU.

2. In consideration for the benefits to Hirata in relation to the Hirata FAS-Coat TEL project, Hirata shall pay to FAS a net fee as follows:

   日本円換算：2,755,250円

   (a) **U.S.$26,750 per coating head.** If an integrated coater shall have more than one single coating head, then the fee shall be equal to the number of such coating heads, multiplied by the net coating head fee.

   日本円換算：110,210,000円

   (b) **Hirata will pay to FAS a net total of U.S.$1,070,000**

   (c) The net amount of U.S.$1,070,000, described in paragraph 2(b) above is calculated as follows: rights and other benefits described above shall be granted to Hirata to build FAS-Coat coating systems for TEL with a combined total of forty (40) coating heads, in any configuration of heads per system, as Hirata and TEL may solely determine; thus

   (d) The payment shall be 40 x $26,750 = 1,070,000 (which is 50% of the total standard payment). **It follows then that the net payment per FAS-Coat head shall be equivalent to U.S. $26,750.**

   **The payment terms shall be as follows:**

   ➢ Hirata shall make an initial purchase to allow development and manufacture of 20 FAS-Coat coating heads (50% of the total order of 40 FAS-Coat head units) for

U.S.$535,000 to be paid immediately upon signing of this MOU.

> Hirata shall deduct from the first payment to FAS the full amount of the Hirata Loan of ¥30,000,000 plus 5 months interest (at a rate of 1% per annum) owed by FAS to Hirata for a total of ¥30,125,000 (approximately U.S.$284,305.40 at January 30, 2004 exchange rate of 105.96 yen per U.S. dollar). In other words, FAS will deduct the full amount of the Hirata Loan from the first payment for the 20 coating heads, **making the first payment due to FAS upon signing of this MOU approximately U.S.$250,694.60.**

> Hirata will pay the **U.S.$535,000** remaining balance in 3 equal monthly payments of approximately **U.S.$178,333.33** starting on March 1, 2004, and subsequently April 1, 2004 and May 1, 2004.

3. Immediately upon execution of this MOU, Hirata shall wire transfer the aforementioned payment(s) to the bank account that is designated by FAS. For the conversion from Japanese yen to U.S. dollar, the foreign exchange rate of The Bank of Tokyo-Mitsubishi, Ltd. (T.T.M.) on the date of payment shall be used.

4. FAS shall issue one FAS-Coat **"Certificate of Authenticity"** per each coating head unit developed and paid for by Hirata for a total of 40 certificates. Such Certificate of Authenticity will each be identified with a unique serial number to allow tracking and confirmation and allocation of the R&D, as well as the other services and rights provided by FAS to Hirata.

5. Each module or system built by Hirata, utilizing one or more FAS-Coat coating heads shall have the name of **FAS-Coat™** engraved in a visible area of the coating unit.

6. This agreement shall be in effect on January 21, 2004 and remains valid until December 31, 2004. Before this agreement is expired, Hirata and FAS shall discuss and agree in detail on the future arrangement.

7. Pursuant to Section 11 of "Definitive Business Venture Agreement" between FAS and Hirata signed October 30, 2001, "Both parties shall cooperate fully to seek patent protection, along with maintaining trade secrets where appropriate and to pursue such protection under mutually agreed terms. Both parties agree to promptly notify in writing each other when it becomes aware of any infringement or misappropriation of intellectual property owned by either party. Each party shall collaborate with the other party to prevent or stop such infringement or misappropriation through either negotiation with such third party or necessary legal action. Any cost incurred shall be shared between the parties based on fair judgment of benefit for each party."

8. The terms in this MOU will be outlined in a **"Definitive Business Venture Agreement"** which will follow no more than 90 days after signing of this MOU. The Definitive Business Venture Agreement, will incorporate the basic concepts of the original such agreement, however modified as mutually agreed to meet the current requirements of the parties, and will include

FAS' and Hirata's future relationship such as the details of the TEL project and Joint Development and Marketing and Business Strategy.

9. None of the terms or provisions of this MOU are intended to diminish or supercede the terms or provisions of any prior definitive or letter agreements between the parties, unless specifically stated in this MOU herein; specifically, nothing herein shall be construed to weaken or diminish any currently existing obligations of confidentiality or non-competition, et al.

Hirata Corporation (Hirata)                FAS Technologies, LLC. (FAS)

_M. Nakamura_                              _[signature]_

Name:  Masaru Nakamura                     Name:   Miguel Friedrich
Title:  Executive Vice President and COO   Title:   Office of the Chairman

2004 / 2 / 20

## 合意事項覚書
### 技術使用、及び開発に関する契約
#### （東京エレクトロン社向け吐出コーター・システム開発について）

日本国〒861-0198熊本県鹿本郡植木町一木 111 に主たる事業所を持つ、平出機工株式会社(子
会社、関係会社を含む) (以後「ヒラタ」という)、並びに 10480 Markison Road, Dallas, Texas 75238,
U.S.A.に主たる営業所を持つ、FAS テクノロジーズ、LLC.(以後、「FAS」という)は、2004 年 1 月 21
日 (以後「発効日」という)のこの合意事項覚書 (以後、「本覚書」という)の締結をもって、ヒラタが
FAS の支援を受けて、スピンレス吐出法(以後、「FAS-コート ™」という)を活用したフォトレジスト・コー
ターを開発し製造するものとする。FAS はヒラタに対して、FAS-コート・コーターを開発し製造す
るために必要な技術の利用を許可するものとする。FAS から付与される技術は、(限定はされない
が)特定サブシステム、部品、必要な特許権、著作権、サービスマーク、及びノウハウの何れか、も
しくは全てを含む。FAS-コート・コーターは、オリジナル装置の製造者(以後、「OEM」という)が、こ
の合意覚書に特定された方法にのみ基づき使用するものとする。ヒラタによる FAS-コート・コーター
は、東京エレクトロン㈱(以後、「TEL」という)への OEM 販売のためにのみ製造される。尚且つ必
要であれば、TEL が他のファクトリー・プロセス装置とも統合を行い、コータープロセス装置の最終
製品のマーケティング、販売、そしてサービスを行うことにつき、両者は合意する。

1.  FAS は、この本覚書に規定された権利実施に関する法的権利を所有することを表明する。

2.  FAS-コートによる TEL プロジェクトと関連して、ヒラタが得る利益を約因とし、ヒラタは下記を正
    価で FAS に支払うものとする。

    (a)  コーターヘッド一台につき、$26,750 US ドルである。統合されたコーターが、一台以上の
         コーターヘッドを持つ場合は、使用料の実施料はコーターヘッドの数とコーターヘッド一台
         の価格をかけて出された額とする。

    (b)  ヒラタは FAS に対して、総額$1,070,000 US ドルを支払う。

    (c)  本項(b)に記載された、正価の$1,070,000US ドルは次の通り計算される。すなわち、ヒラ
         タと TEL の 2 社のみの判断で決定する、システムごとのヘッドの数に関係なく、コーターヘ
         ッドを合計 40 台搭載した、TEL 向けの FAS-コート・コーターシステムを製造するために、上
         記に説明された権利や利益はヒラタに与えられるものとする。すなわち、

    (d)  支払い額は、40×$26,750＝$1,070,000（標準支払い額の半額である）とする。FAS-コー

ト・ヘッドの 1 台あたりの正価が、**$26,750 US ドルに相当する。**

支払い条件は次の通りとする。

➤ ヒラタが FAS-コート・コーターヘッドを開発し、20 台（FAS-コート・コーターヘッドユニットのオーダー合計 40 台のうちの 50%）製造することをできるように、この了解事項覚書への署名の後すぐに**$535,000US ドル**を支払い、最初の購入を行う。

➤ ヒラタは FAS への最初の支払いから、ヒラタから FAS への貸付金総額¥30,000,000 プラス 5 ヶ月分の金利（1 年毎に 1%の利率）、つまり¥30,125,000（2004 年 1 月 30 日の為替レート、1US$＝¥105.96 で、$284,305.40US ドル）。つまり、FAS はヒラタからの貸付金の全額をコーターヘッド 20 台分の最初の支払いから控除し、ヒラタは**本覚書の署名の後に、$250,694.60US ドル**を支払う。

➤ ヒラタは残額**$535,000** を、2004 年 3 月 1 日、続いて同年 4 月 1 日、及び同年 5 月 1 日に、毎月**$178,333.33US ドル**の 3 回払いで支払う。

3. ヒラタは本覚書の執行後すぐに、前述の支払い方法により、FAS に指定される銀行口座に US ドルで電子送金するものとする。日本円から US ドルへの換金については、2004 年 3 月 1 日、4 月 1 日、5 月 1 日の、東京三菱銀行（T.T.M.）の外国為替換金レートによるものとする。

4. FAS は、ヒラタにより開発され支払いが行われたコーターヘッドの 1 つ 1 つに、FAS-コート「信性証明書」を発行し、合計 40 部発行するものとする。前述の信頼性証明書は、FAS からヒラタへ与えられたその他の業務や権利だけでなく、トラッキング、R&D 資金の配分の確認のために、数が重複しないシリアルナンバーを指定する。

5. ヒラタにより製造された、FAS-コート・コーターヘッドを 1 台もしくは複数台備えたモジュールやシステムは、コーターユニットの、見える場所に **FAS-Coat™** と銘記されるものとする。

6. 本覚書は 2004 年 1 月 21 日に発効され、同年 12 月 31 日まで効力を持つものとする。本覚書が満了となる以前に、ヒラタと FAS は以後の措置についての詳細を話し合い合意するものとする。

7. 両社は、本覚書を作成するに際し、下記に引用する「最終業務提携契約」（2001 年 10 月 30 日に締結）を実施する。

================= 以下引用 =================

両当事者は緊密な協力のもとに、パテントの保護ならびに取り引きに関係する適正な機密保持につとめ、相互で合意された条件に基づき保護するものとする。本 BVA に関連して、当事者のいずれかの知的財産の権利侵害や悪用が発覚した場合は、書面にて即座に通告し合うことに、両者は同意する。当事者は、第三者との協議や必要な法律行為のもとに、相互に協力してそのような権利侵害や悪用を阻止、また停止しなければならない。これによって生じた経費は両者の利益の公平な判断に基づいて当事者で負担されなければならない。

================== 引用終了 ==================

8. 本覚書の条件については、本覚書の署名後 90 日までに締結される「最終業務提携契約」に説明されるものとする。最終業務提携契約は、オリジナルの業務提携契約のコンセプトを基本として、両当事者の必要性に応じて相互の合意で修正されるものとし、TEL プロジェクト、共同開発、マーケティング、ビジネス戦略の詳細等の、FAS とヒラタの今後の関係を含むものとする。

9. 本覚書においての条件は、本覚書に特筆されていない限り、先に締結した両当事者間の最終契約や書簡契約においての条件、規定を軽減させたり、無効にさせたりするものではない。つまり、本覚書は機密性もしくは競合禁止、及びその他のものについての、現在において存在する規定を弱めたり減少させたりするものではない。

平田機工株式会社(ヒラタ)　　　　　　　FAS テクノロジーズ, LLC.(FAS)

氏名：　　　　　　　　　　　　　　　　氏名：Miguel Friedrich
役職：　　　　　　　　　　　　　　　　役職：役員室

### MEMORANDUM OF UNDERSTANDING
#### TECHNOLOGY ACCESS & DEVELOPMENT AGREEMENT
(for development of Extrusion Coating Systems for Tokyo Electron)

Hirata Corporation, including its subsidiaries and its affiliates, with main offices at 111 Hitotsugi, Ueki, Kamoto, Kumamoto 861-0198, Japan (hereinafter referred to as **"Hirata"**) and FAS Technologies, LLC., with main offices at 10480 Markison Road, Dallas, Texas 75238, U.S.A. (hereinafter referred to as **"FAS"**) in this MEMORANDUM OF UNDERSTANDING (hereinafter referred to as **"this MOU"**) as of January 21, 2004 (hereinafter referred to as the **"Effective Date"**), agree that Hirata, with certain assistance from FAS, shall develop and manufacture photoresist coaters, utilizing a spinless extrusion method (such method hereinafter shall be referred to as **"FAS-Coat тм "**). FAS shall provide access for Hirata to the necessary technology for development and manufacture of the FAS-Coat coaters. Such technology

APP.48